Good morning. We have three cases that are scheduled for oral argument this morning. We'll be here all week. Judge Newsom and I are delighted that Judge Proctor from the Northern District of Alabama will sit with us this week. Judge, we appreciate your coming down from Birmingham to help us decide these cases this week. Thank you. I'll call the first case. It looks like lawyers are ready. Leon Carmichael, Sr. v. United States of America. Mr. Petrani is here for the appellant. Mr. Ross for the government. Ready to proceed, Mr. Petrani. Thank you, Your Honor. May it please the Court. My name is Stephen Petrani and I represent Leon Carmichael, the appellant. The sole issue in this case is whether or not Mr. Carmichael is prejudiced by his attorney's reasons. The district court erred when it held that he was not. Can I ask you a threshold question? Yes. Delicate, and to the extent you can't answer for attorney-client reasons, that's fine. I was curious about your decision not to file your own brief, to ride the pro se brief that was filed. I just haven't seen that before. Typically when we appoint lawyers, they file a new round of briefs and you didn't, and I'm just curious about why. Well, without getting into any attorney-client confidences, what I'll say is we think that the pro se briefs very well point out the legal errors in the district court's opinion. The primary two of those errors that I'll be discussing today, the first is that the district court failed to examine the totality of the prejudice arising from all of the attorney errors in the case, and second, that it applied the wrong legal standard, holding Mr. Carmichael to a more likely than not burden of proof. And turning to the first of those errors, the failure to examine all of the prejudice from all of the attorney errors, I want to focus on three points that are not disputed, but which the district court did not even consider in its prejudice analysis. One, Mr. Carmichael's attorneys never advised him of his guidelines range. Two, despite his express instructions, they did not pursue plea negotiations prior to trial. And three, he knew his attorneys were woefully unprepared for trial. Now, if you take all of these into account, in addition to his attorney's failure to inform him of the government's favorable 20-year offer with a chance to get it down to 10 prior to trial, there's at the very least a strong probability sufficient to undermine confidence in the outcome. Well, there has to be a reasonable probability. Yes, there has to be a reasonable probability, but it doesn't have to be more likely than not. Let me ask you this now. You know, he had 12 different lawyers, and if we accept the government's concession that he was denied the effective assistance, at least with regard to the first prong of the Strickland versus Washington analysis, that he received ineffective assistance, all we're here to decide is whether or not the district court was wrong with regard to whether or not he established prejudice at the evidentiary hearing, right? Whether he established prejudice, yes. Okay. And so, I mean, when we look at the evidentiary hearing, one of the things that I'm looking for, did he ever say that he would accept an offer from the government without a 20-year max guarantee? I don't know that he ever said that at the evidentiary hearing where that was established, number one, and number two, that he was in a position to provide substantial assistance to the government. Could you address those two things for us? Of course, yes. So, first of all, he did say on multiple occasions that he would never have gone to trial if he had known what his guidelines range was, which I think very impliedly is saying that he would have accepted, as he puts it, any reasonable offer. That's at transcript 118, and at 130, he says he would never have gone to trial if he had been properly advised of his guidelines range. But even after trial, when he knew what the guideline range was, and the government put 20 years back on the table, his lawyers advised him, you're not going to get more than 20 years, and he went to sentencing. Well, actually, Your Honor, I think that that's one of the strongest pieces of evidence in the case for Mr. Carmichael. Contrary to the government's brief at 7 and 23, he tried to accept that offer. Now, he went into that meeting... What record evidence is there of that? Because I didn't see that in the record. The district court says it at 15 and 16 of its opinion, and also his testimony and the government attorney's testimony. What happened was he went into this final meeting with the government attorney, having already been advised that 20 years was probably a bad deal. But the government attorney mentioned to him that actually it wasn't a bad deal. He could be spending a lot more time than 20 years in prison if he didn't accept it. And that was the first time that he ever had any indication of what his true guidelines exposure was. Didn't the magistrate judge at his arraignment tell him that you could get life in prison? Yes, 10 years to life, statutory minimum, statutory maximum. But the guidelines range is incredibly important for determining... In fact, the district court itself, although it later ignored this, said on page 25 of its opinion that it's essential to a discussion of whether or not to plea to know what your guidelines range is. And it was particularly important here, given that his guidelines range was astronomical compared to the favorable offer that the government had given him. But I'd just like to turn back to this discussion. He then went to his attorneys who... His appellate attorney and his senior attorney advised him, don't take this deal. And he went against their advice and hired another attorney, Michael Ufferman, to try to accept that deal. Now, it was too late at that point. But this is strong contemporaneous evidence that the very first time that he had any sense of his guidelines range, he tried to accept a not particularly great deal, not nearly as good as the one he could have gotten before. Once that happened, did he agree? Did he say that I will accept the plea without a 20-year max? With a 20-year max? Well, yes, that was what he was trying to accept. The government attorney at that point made it very clear that 20 years was the best that he could hope for. In fact, the plea offer that the government was making at that point was maybe he could get it to 20 years with cooperation. And that was the offer that he rejected his attorney's advice and tried to accept. Did he say that at the evidence you were hearing? Did he say which part? That he would be willing to accept the government's offer without a 20-year max guarantee. Well, I don't know if he put it in those words exactly, but he explained that he tried to accept that offer and that offer, which was very clear at the point. Counsel, do you contend any of the habeas trial court's findings of fact were erroneous? So, I think the vast majority of them were fine. I think a few things that... Fine meaning not erroneous? Not erroneous. All right. Now, a few times the district court says things that are really more conclusions than factual findings like there was no evidence of such and such. I would not accept those. So, for instance, the district court says there was no evidence he could have provided substantial assistance. I don't think that's true, and I also don't think it's nearly as relevant as the district court thought it was. The question is not could he have provided substantial assistance. It's would he... Well, it may be relevant this way. How many offers were there made by the government in this case, according to the district court? According to the district court, three. One prior to trial, one immediately following conviction. What was the one prior to trial? What was the terms of the offer made? It was 20 years with a chance to get it down to 10 with substantial assistance. So, your position is that's all one offer with a sliding scale depending on super cooperation? Yeah. I mean, it really has to be because otherwise it's not clear where the 10 years would be coming from. It has to come from somewhere, and the idea was it comes from 20 years with the opportunity to get it down to 10. And so, the question... And just so I'm clear, where does the forfeiture of the Carmichael Center factor in, both to 10 and 20 or only to the... He would have had to forfeit the Carmichael Center for both. But the district court didn't think that that was a problem at all. The district court did not rely on the Carmichael Center as a problem, in large part because he did forfeit the Carmichael Center before he even had a forfeiture hearing just to protect some other property. And he testified repeatedly he would have forfeited it, and that really isn't an issue at this point. But getting back to substantial assistance, the question, again, is whether there is a substantial possibility he would have accepted this plea deal. Now, it does make it more likely that he would have accepted the plea deal, that he had this opportunity to get it down to 10 years. Okay, so now, did he say at the evidentiary hearing that he will provide substantial assistance to the government? Because the impression that I get is that the government is more concerned about the substantial assistance than it is about the 40-year prison sentence. They really want his cooperation in this case. So, he said repeatedly, again and again and again, that he would have accepted the government plea offer. The government plea offer, everybody knew at the evidentiary hearing, involved substantial assistance. So, he was impliedly saying that, and it wasn't an argument. The government didn't argue this below. This was not the government's argument below. They argued about ineffective performance and about the Carmichael Center. They were asked the specific question, would you have provided substantial assistance? But on numerous occasions, he said he would have accepted the deal, and we know that the deal involves substantial assistance. You said the trial court said that Carmichael Center wasn't a problem, but in the footnote at the end, footnote 14, where it's saying, because there's no prejudice, we need not worry about constructing a remedy. It specifically says, as noted, Carmichael has presented no evidence he would have accepted the terms of FIGA's 10-year proposal, which included the requirement that he provide high-value substantial assistance. That's a finding that he wouldn't have accepted the 10-year deal, at least, for those two reasons, right? So, I think that the district court had to be referring to the substantial assistance part, not the Carmichael Center part. Except for referencing the Carmichael Center, right? Well, for a couple of reasons. One is, he repeatedly, again and again and again, stated he would have given up the Carmichael Center. When did he say that? After the habeas case was filed? At the evidentiary hearing. And he also gave up the Carmichael Center before he had his right to a forfeiture hearing to determine whether he had to or not. And so, I think it's clear from the district court's opinion, it's not really relying on that as you go through all of its findings of fact. But I'd also like to point out, in the brief time I have remaining, that although I don't think it's particularly, nearly as relevant as the government does, the evidence that he could have provided substantial assistance, there are at least four major pieces of evidence. One is, he was indicted for a massive conspiracy. And in fact, the government sought and obtained a leader organizer offense level increase. And he was held to have been the leader of dozens of people. So, that's one thing. Another thing is, Louis Franklin, the chief of the criminal division at the time, said he thought Carmichael had information. Third, the government offered him plea agreements both before and after conviction in an attempt to obtain his substantial assistance, which says, in all likelihood, that he can provide some to the government. And there was also, fourth, some testimony on this. The government attorney, Fayega, testified that he thought that the government would have liked to know where hundreds of pounds of marijuana were coming into Alabama every month. And Mr. Carmichael himself testified about the possibility of being a government witness. So, there is substantial evidence of this. But I just want to bring it back to the point that the question is, is there at least a possibility, a substantial possibility, but not more likely than not, that he would accept this offer? A reasonable probability is what the court says. Is there a reasonable probability that he would accept the government's offer but for the efficient performance by his lawyer? So, I guess, at least what I am trying to get at is, is he willing to provide substantial assistance and is he willing to accept a plea offer without a 20-year max guarantee? Because the government can't guarantee 20-year max anyway. All the government can do is make a recommendation to the district judge what the district judge can reject. So, he can't get a guarantee. I see my time has expired, but I'll try to answer the question briefly. Again, if you look at all of the attorney errors, he had no chance to see how disparate his sentence was or his likely guidelines was from this favorable offer. If he had known that, that's very strong evidence he would have accepted the plea. He knew his attorneys were not ready for trial. He tried to get his attorneys to negotiate a plea deal, and his attorneys never told him about it. I think when you put all of that together, that provides at least a strong possibility that he would have pleaded guilty. All right. You've reserved some time for rebuttal, Mr. Petrani, and we'll hear from the government. Mr. Ross. Your Honor, may it please the Court, Jonathan Ross on behalf of the United States. Leon Carmichael was not prejudiced. There are two main reasons. First, the fact that Mr. Carmichael maintained his innocence throughout these proceedings. Mr. Carmichael was adamant before trial that he was not guilty. His attorney, Ms. James, testified at the evidentiary hearing when she acknowledged that she likely did not convey the offers, that she didn't do it because, I think she said, it wasn't going to matter. He was dead set for trial. This case was going to trial. Yes, Your Honor. Yes, but the government offered him a plea deal after he was convicted. Yes, Your Honor. Right? Yes, Your Honor. And the offer after conviction was simply to resolve sentencing and appellate issues and forfeiture. So, the fact that he pled not guilty and went to trial, doesn't that undercut your argument that he was not provided ineffective assistance because he went to trial? I mean, you offered him a plea deal after he was convicted. You didn't have to do that, did you? Your Honor, the government offered him a deal simply in an effort to obtain his cooperation. However… That's what the government really wants in this case, is his cooperation. Yes, Your Honor. At the time, at the post-trial period, the government was still hopeful to obtain Mr. Carmichael's cooperation. But looking at what is, whether there's a reasonable probability before trial that had Mr. Carmichael receive the offer, it's not likely, or there's no reasonable possibility that he would have taken an offer. What about after trial? He says there's a reasonable probability that but for deficient performance on the part of my lawyers after my conviction, I would have taken the plea deal that was offered by the government. In fact, I went out and hired a plea expert after I was convicted, Mr. Uferman. He went out and hired a plea expert. Isn't that an indication that he was amenable to a plea? Number one. And number two, two government lawyers testified at the evidentiary hearing that he was amenable to a plea. Right? Your Honor. Didn't AUSA FIGA testify that he was amenable to a plea? So to answer first, the district court did not find deficient performance arising after trial. The district court expressly found that the advice of Ms. James to Mr. Carmichael after trial to reject the 20-year offer was not unreasonable. And the only issue is whether there was deficient performance arising out of the pretrial errors, the failure to convey plea agreement offers, the failure to advise the guidelines range, and the failure to initiate plea negotiations earlier. All right. Well, what did the district court say with regard to deficient performance after trial when the government offered him a plea agreement? The district court found that that was not deficient. So the government offered Mr. Carmichael a plea agreement expressly to his face. So there was no issue of failure to convey the offer because both negotiations after trial occurred in Mr. Carmichael's presence. And I'll turn just a moment to this. The government's conceding deficient performance, right? The government concedes deficient performance as to the three pretrial issues, the failure to convey the offers, the failure— The government doesn't concede deficient performance with regard to the post-trial offers? No, Your Honor. And I do not—the district court did not find deficient performance as to the post-trial offers. There was no issue of conveying because Mr. Carmichael was there. One discussion occurred in this building in the— Well, I'm confused then. The government offered him a plea after he was convicted. Yes, Your Honor. And so his allegation is that I would have accepted a plea if my lawyers had—post-trial, if my lawyers had provided effective assistance. We're not here on that issue? No, Your Honor. As the government understands the issue and as I believe the district court found, the issue is whether Mr. Carmichael would have accepted a plea had his attorneys properly advised him of the negotiations after trial. The only issue—so there's no conveying the offer issue because he heard it from the horse's mouth when the government spoke—conveyed the offers. The only issue after trial would be the advice of Ms. James to reject the 20-year offer, and the district court expressly found that that was not unreasonable. But does the government concede that with regard to the post-trial offer that the government says he rejected, that there was deficient performance? No, Your Honor. That's not what I understood from the brief. Your Honor, and I apologize if the brief was not clearer, I don't believe that there was any finding by the district court that there was deficient performance arising after trial. Was there deficient performance after trial? No, Your Honor. And the only alleged attorney error from after trial was this issue of Ms. James saying, don't take the 20-year deal because the sentencing court will likely not impose a 20-year sentence anyway. And Jenkins gave him the same advice, right? Yes, Your Honor. Yes, Your Honor. Mr. Jenkins had been hired for the appeal. So the post-trial period is really just instructive as to what would have happened pre-trial had Mr. Carmichael received the offers. This issue of the guidelines range, the fact that allegedly the district court failed to consider the fact that Mr. Carmichael was not advised of the guidelines range, a few points to that. And admittedly, the district court did not turn back to the guidelines issue in its prejudice analysis. I think you can assume from its opinion that the guidelines range was sort of, the district court applied prejudice considering had Mr. Carmichael been advised of the guidelines range and received these offers, what would have happened. Chronologically, as I understand the record, Yes, Your Honor. James tells him not to take the 20-year plea because based on his age, she does not believe the district judge will sentence him to more than 20 years. Jenkins gives him the same advice. He's concerned. He reaches out to Chardoff. Chardoff says there may be some issue here because Jenkins is going to get a big fee if this goes all the way through sentencing. Chardoff puts him in touch with Ufferman. Ufferman goes to the government to seek a plea. And at that point, there's no plea offer on the table from the government. Yes, Your Honor. And that chronology is important because this argument that had he known about the guidelines range, he would have taken a deal pre-trial. He didn't take the deal after trial when he did know that he was facing 360 to life. So there was no post-trial offer from the government? Yes, Your Honor. There was a post-trial offer. Mr. Fega said if you're willing to come in and work, if you're willing to make calls, provide information, then there's a possibility that you can get your sentence down to 20 years. He said that to Mr. Carmichael at the Elmore County Jail, and it was just him and Mr. Carmichael. And according to Mr. Fega, during the evidentiary hearing, Mr. Carmichael's response sitting at the table was, I'll take my chances on appeal. Well, his first response was if you can guarantee me 20 years, I'll work. Yes. But if you can't guarantee me 20, if you can't give me a guarantee, I'm not going to work. Exactly. In so many words. And that's important because that was the same offer pre-trial. Pre-trial, the government said, you know, come in, cooperate, and you can get 20, and if you super cooperate, you can get 10. And Mr. Carmichael post-trial was adamant that he wanted a guarantee. And the government doesn't guarantee anything to anyone without first hearing what the person has to say. Let's say for argument purposes that we find that with regard to the post-trial offer, he was denied the effective assistance of counsel, and we vacate not his conviction, but we vacate his sentence and send it back. What would the remedy be? That the government would still have an opportunity to make an offer which he could accept or reject? What would happen? What would happen then? Your Honor, the court, and I believe the Supreme Court laid this out in Lafler, the court could do one of, the court could remand at the district court, and the district court could do one of three things. It could reimpose a sentence in accordance with the plea offer, which would be a 20-year sentence. The district court could reimpose the same 40-year sentence, or the district court could reimpose or could impose a sentence somewhere in between. So Mr. Carmichael and the government could reach a deal, right? Yes. Okay. And then the government would get what it wants, which would be super cooperation. That's what the government really wants in this case, isn't it? Well, Your Honor, at this point, 12 years have passed since the sentencing hearing and 14 since the trial. And so it is unlikely at this point that Mr. Carmichael would be in a position to offer any cooperation. Moreover, should the district court get the case back and resentence, it would not be bound to the information before it at the time of the original sentencing hearing but could consider any information that's arisen post. How do you respond to Mr. Petrani's point there at the end of his argument that there are sort of, you can sort of weave together a story through the four buckets that he mentioned right there at the end about substantial cooperation? Yes, Your Honor. To those points, those are all indicators that Mr. Carmichael would have been someone to talk to, someone who might have information. But it happens routinely that defendants look like they're in a position to cooperate. They look like they might know something and for various reasons turn out to not be able to provide substantial assistance. You can't. That's why the government doesn't guarantee deals before they hear from the defendants because you never know whether, you know, bad memory, perhaps there's a lot of publicity in this case. And so some of the super cooperation involved the likelihood that maybe he could make calls, work as an undercover informant, and it's possible that because this case was so public, Mr. Carmichael would not have been able to do that. It's possible that he was shielded from the people in Texas from whom he was buying marijuana and he wouldn't actually have known that much about them. Not every leader organizer is somebody who can provide assistance, particularly assistance of the type the government was looking for. It's possible that at the time the DEA was targeting one organization in Texas and Mr. Carmichael was dealing with a wholly separate one. It's too speculative to say that just because he was indicted as the leader of a conspiracy, he could cooperate. Just generally following up on that, what do you understand our task would be under Frye when there's not a formal offer? Well, how do we go about assessing that? How do we, if we conclude there's prejudice, how would we construct a remedy? What are some of the matters, let's say pretrial, that we'd look at? And, Your Honor, that is a challenge in this case because Frye was limited to a formal offer and it's easier to apply the Frye frame. But the district court said Frye left room in the joints for informal offers pretrial. And I think this court's challenge would then be to say what would the informal discussions have turned into and then what would have happened if you extrapolate out to a formal offer and then what would Mr. Carmichael have done with that formal offer? And also relevant is what the district court would have done. I'm sorry, Judge Wilson. How do you turn an informal offer into a formal offer? And that is a challenge of this case is that... A formal offer doesn't have to be in writing, does it? No, Your Honor, until it's reduced to a plea agreement, until it's reduced to a written plea agreement sent to defense counsel. Right. But the offer comes before the agreement. But a formal offer could be lawyers across the table. If he agrees to plead guilty, we'll recommend 20 years, right? The government can't then go back at the sentencing hearing and recommend 40 years. That would be a formal offer. The defendant would be entitled to accept the government at its word if it was just a verbal communication across the table, wouldn't it? Your Honor, I believe that it's the practice of the attorney's office that any, all plea negotiations, I wouldn't say all, most plea negotiations likely start with discussions across the table or over the telephone, but they all are eventually reduced to a plea agreement. And that is a point about this case that has been missed and wasn't raised in the brief, but I will mention it. But an offer doesn't have to be in writing. No, Your Honor, but it would have had to lead to an agreement. And there's never, the district court didn't consider, and this never came up, whether the offer was for a B plea agreement or a C plea agreement. And if it was for a C plea agreement, then the district court would have had the option of rejecting the plea agreement. And the district court in its order in this case said, well, there's no evidence the district court would have rejected the plea agreement. Well, the district court can reject the plea agreement in either event, the difference being with the mandatory subdivision, the person can withdraw the plea. Yes, Your Honor, yes, the district court could have, had it been a B plea agreement, the district court could have. Because that's one of the elements of the showing that petitioner has to make is that the court would have accepted the plea. Yes, Your Honor. So how do we, do these same elements apply in an informal offer? Yes, Your Honor. How do we, how do we, first it's hard enough to divine what informal pleas would have led to between the parties. How do we divine what an informal plea process would have, how it would have influenced the court? And, Your Honor, I think you could say, you could cut it off and say it's too speculative entirely. It's too speculative a challenge, a task to say what this would have led to in terms of a formal offer, and therefore you can't show prejudice. And that would be a per se rule that, you know, when they're. Let me get your response to one thing your opponent said, and that is the Carmichael Center wasn't an issue. That's not the way I read the record, but I'd like to hear your viewpoint. May I answer the previous question? Yes, I'm sorry. Your Honor, as to how do we divine what the district court might have done, looking at the sentencing transcript and the sentence, the outcome of sentencing, the district court had a range of 360 to life. It imposed a sentence of 480 months, so 10 years above the bottom of the range and gave reasons after a two-day sentencing hearing, gave reasons that because of the breadth of the conspiracy in Mr. Carmichael's actions, there's also testimony about Mr. Carmichael's violence that came out of the sentencing hearing. I think there's some indication in the record, and this is contrary to the opinion of this court in this case previously, but there is some indication in the record that the district court wouldn't have gone along with a 20-year offer and certainly wouldn't have gone along with a sentence as low as 10. As to the Carmichael Center, and I see my time has expired, if I may answer the question. As to the Carmichael Center, that was a significant point before the evidentiary hearing, that Mr. Carmichael is adamant that he did not want to give up the Carmichael Center. At the evidentiary hearing, Mr. Carmichael testified to the contrary, and Ms. James testified to the contrary. The district court did not find the Carmichael Center to be an impediment to a plea agreement, and the government does not push that argument on appeal. What about the footnote 14? Is that just loose language the district court threw in that sentence? Yes, Your Honor. To that point, I agree with the counsel, Mr. Carmichael. Well, I have just one more question that you can help me with. Earlier, you mentioned the Supreme Court's opinion in Lafler v. Cooper. Yes, Your Honor. It seems to me that case actually helps him because the Supreme Court said that as long as he shows, and these are the words that the court uses, a reasonable probability that but for his counsel's errors, he would plead guilty, he establishes prejudice, and we're just here on prejudice. So when I look at the fact that his lawyers, that he requested that his lawyers pursue a plea before trial, and then after he was convicted, he hired a plea expert, Mr. Ufferman, to pursue a plea, and Assistant U.S. Attorney Stephen Fager and James both testified at the evidentiary hearing that he was amenable to a plea. This is one of the government lawyers. How do we not find that there's a reasonable probability that but for his counsel's errors, he would have pled guilty? He would not have pled guilty. So if you, to respond to those specific things. When I take all those factors into consideration. Yes, Your Honor. Applying Lafler v. Cooper. Yes, Your Honor. So as to the fact that he hired a plea expert, Mr. Carmichael hired a lot of lawyers. Mr. Fager and Mr. Carmichael sat down at the table and Mr. Fager made an offer. He didn't need to hire an expert. He didn't need to wait two months lapsed between the meeting in August of 2015 at the jail and Mr. Ufferman contacting Mr. Fager in October. So a two-month lag and Mr. Carmichael went out and talked to four different lawyers and then sent Mr. Ufferman. It's not strong evidence of an eagerness to plead. That is strong evidence of somebody. And also Mr. Ufferman was not sent to accept the 20-year deal. He was sent to negotiate. Even though the government's lawyer testified that he's amenable to a plea? And Your Honor, that was Mr. Fager spoke to Mr. Carmichael after trial. This court's, the focus in this case is what Mr. Carmichael would have done had he received the plea offers before trial. And to that there are two significant points that make clear that under no circumstances would Mr. Carmichael have taken a plea. The first, he maintained his innocence. He could not have gotten through a plea colloquy even if he had tried to plead guilty. He could not have admitted under oath that he conspired to distribute more than 3,000 kilograms of marijuana. And second, that Mr. Carmichael refused to sit down and talk to the government. He refused to sit down and talk to the government after trial. And if he refused to talk after trial, then there can be no reasonable probability that Mr. Carmichael would have been amenable to talking before trial when at that point he still had the possibility of an acquittal at trial. If there are no further questions, thank you, Your Honor. Thank you, Mr. Ross. Mr. Petrani? Thank you, Your Honor. Just at the very outset, can you clarify the confusion about whether or not there is a claim here in effect for post-trial conduct? So this was my first point. There was an effect of assistance post-trial. The failure to advise him of his guidelines went past the trial. But as to the plea issue? Yeah. Well, what I mean is because he was failed to – because his lawyers did not advise him of his guidelines, necessarily he was failed with respect to the plea negotiations post-trial. How many tons of marijuana was your client charged with importing into the state? He was charged with, I believe, over 3,000 kilograms. That's a lot of drugs. It is. Yes. And to suggest here that he didn't know he was looking to serious sentence strains credulity, doesn't it? I don't think it does. He had – as I said, the 10-year to life is a very broad range. It's not clear under the statutory circumstances what you're going to get. If he had known prior to trial that his guidelines range under the indictment would have been life, not even what he ended up getting, which was almost guaranteed, 30 to life guidelines range, but would have been life, that changes everything about his potential sitting down with the government. It changes everything that he's going to do. If he, after being convicted and knowing of his guideline range, wanted a guarantee before he would do anything toward committing to a plea or working for a plea, why wouldn't we, from this record, understand that he had the same view before trial? That he wanted a guarantee, not a plea deal that had loose room in the joints. So I don't think that there was ever a point, and the district court certainly did not find that there was a point, where he demanded a guarantee after he had been advised of his guidelines range. And, in fact, he knew that the offer from the government attorney, Fayega… He wanted a guarantee when he sat it down one-on-one with Fayega. Yes. That's what the district court found. He knew about the guideline range at that point. No, he did not. He did not. No. Going into that meeting, he did not. The first inkling he got of his sentencing exposure was towards the end of that meeting with Fayega, which is why it's such strong evidence that he then goes and rejects his own attorney's advice with even just the government attorney's word for the fact that his sentencing exposure is, in fact, very high. But I want to quickly reach two other points the government made. First of all, the government says that innocence is somehow relevant here. The district court didn't think it was relevant. This court, when it remanded it, the case said, well, yeah, he had maintained his innocence, but he also tried to get his attorneys to pursue plea negotiations. Maintaining one's innocence is the right of a criminal defendant. It doesn't mean you're not going to plead. And, in fact, Susan James, the only one who testified that he had maintained his innocence, also said at the transcript at 67 that he would have been amenable to a plea agreement. She thought it was going to take slightly fewer years, but he would have been amenable. So I don't think that that's very strong evidence at all. And then the government admits that all the reasons I laid out to you about support your time runs out. What remedy are you seeking at the end of the day here? Well, the remedy we think would be appropriate is for the court to reverse remand to the district court to enter a new sentence. And we think what should that I mean. So we pick a number out of the hat. How do we do that? So if this court were to do it itself, I would argue, of course, that given what I think is very strong evidence of his ability to provide substantial assistance, that it would remand with directions to institute a new sentence of 10 years. But barring that, the court could simply remand to the district court. Where do you get 10 years? Well, that's based on the likelihood that he could have provided substantial assistance to the government and gotten that. Oh, you have to provide the substantial assistance. We can't say he could have provided substantial assistance, give him 10 years. Regardless of which court you're going to ask the remedy from, what remedy are you seeking? Let's pin you down on that at least. Well, so again, the remedy would be, I think, would be a resentencing. And I do think that the Supreme Court in Lafler and Frye said that courts have extraordinary discretion in this area. So I do think the court could order a resentencing. Well, if we vacate not his conviction but his sentence and send it back for resentencing, it's up to the district court. We can't tell the district court what to do. And you would just have to take your chances that the government is still willing to extend a plea offer. If we vacate his sentence and remand it back, there's no obligation on the part of the government to offer a plea deal. You just have that opportunity that maybe they'd offer and maybe they wouldn't, right? Well, one common remedy, I struggle to say common because this doesn't come up very often because attorneys aren't usually this deficient. But one remedy that courts have used in the past is to order the government to give the plea offer that it had given pretrial. But the court doesn't have to do that. The Supreme Court in Lafler and Frye also made clear that it can directly resentence, you know, juggling the various factors to figure out what a fair sentence would be. So he could still get 40 years. I don't think so. The way that the court put it in Lafler and Frye was that he could be given something, you know, at or below or somewhere in between where his plea offer might have been. But with that being said, admittedly, there is a lot of discretion on the part of the district court. For all these reasons, we think that you should reverse. Thank you. Thank you, Mr. Petrani, Mr. Ross. Thank you.